IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                     No. 14-20235-SHL-dkv

DARRELL RANDOLPH,
a/k/a Big C,
a/k/a Big Church,
a/k/a Big Churp,
a/k/a Big,

    Defendant.

_____

REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION
TO SUPPRESS

_____

On September 16, 2014, the grand jury returned a six-count indictment charging the defendant Darrell Randolph ("Randolph"), with possession with intent to distribute cocaine base, cocaine, heroin and marijuana in violation of 21 U.S.C. § 841(a)(1), possession of a firearm as a convicted felon in violation of 18 U.S.C. § 922(g), and possession of a firearm in furtherance of a drug-trafficking crime in violation of 18 U.S.C. § 924(c). (Indictment, ECF No. 1.) These charges arise out of an investigation by the Shelby County Sheriff's Office Special Victims Unit, which led to Randolph's arrest on March 6, 2014 and to the search of Randolph's residence located at 7108 Market

Square, Memphis, TN 38125 ("Market Square residence") on a search warrant on March 7, 2014.

Now before the court is Randolph's January 30, 2015 motion to suppress evidence recovered from the Market Square residence. (Def.'s Mot. to Suppress 1, ECF No. 19.)[1]  Randolph also seeks to suppress any statement "elicited from [Randolph] by law enforcement officials during the course or immediately following the execution of said search warrants." (*Id.*)  The government filed a response on February 10, 2015. (Gov't's Resp., ECF No. 25.)  The motion was referred to the United States Magistrate Judge for a report and recommendation. (ECF No. 21.)  Pursuant to the reference, the court held an evidentiary hearing on March 16 and April 3, 2015.

At the hearing, the government did not call any witnesses and did not introduce any exhibits.  Randolph called nine witnesses: (1) Shelby County Sheriff's Office Detective Jessica Hawkins ("Detective Hawkins"), (2) Shelby County Officer Darryl Blake ("Officer Blake"), (3) Department of Children Services

---

[1] Randolph also moves to suppress any evidence obtained by law enforcement officers at his other residence located at 4299 Coral Creek, Memphis, TN 38125 ("Coral Creek residence") on March 5, 2014 pursuant to a search warrant. (Def.'s Mot. to Suppress 1, ECF No. 19.)  The government maintains that it does not intend to use any of the items recovered at the Coral Creek residence in its case-in-chief. (*See* Gov't's Resp. 3, ECF No. 25.)  The court therefore recommends that the motion to suppress evidence obtained at the Coral Creek residence be denied as moot.

("DCS") Investigator Sabrina Wallace ("Wallace"), (4) himself in a limited capacity, (5) his wife Monique Polk, (6) Shelby County Sheriff's Office Sargent Natalie Hillman ("Sgt. Hillman"), (7) Shelby County Sheriff's Office Detective Paul Vance ("Detective Vance"), (8) his sister-in-law Christle Polk, and (9) his sister-in-law April Polk. Randolph introduced six exhibits into evidence: (1) Coral Creek Incident Report dated February 12, 2014, (Ex. 1); (2) Affidavit for Search Warrant for the Market Square residence dated March 7, 2014, signed by affiant Detective Hawkins, (Ex. 2); (3) Affidavit of Complaint dated March 5, 2014, signed by affiant Sgt. Hillman, (Ex. 3); (4) Affidavit for Search Warrant for the Coral Creek residence dated March 6, 2014, (Ex. 4); (5) Affidavit for Search Warrant for the Market Square residence dated March 7, 2014, signed by affiants Detectives Jones and Vance, (Ex. 5); (6) Affidavit of Complaint dated March 10, 2014, signed by affiants Detective Jones and Detective Vance, (Ex. 6).

After careful consideration of the statements of counsel, the testimony of the witnesses, the evidentiary exhibits, and the entire record in this case, this court submits the following findings of fact and conclusions of law and recommends that the motion to suppress be denied.

## I.   PROPOSED FINDINGS OF FACT

### A.   The Runaway Incident and Tyaira's Allegations

On February 12, 2014, Tyaira Polk, Monique Polk's daughter and Randolph's step-daughter, ran away from her house. She was fifteen years old at the time. Monique Polk ("Polk") and Randolph, who have been married since 2013, both testified about the events surrounding this incident. On the morning of February 12, 2014, before she left for school, Tyaira had an altercation with Polk. Polk testified that she told Tyaira she would deal with the situation when Tyaira came home from school; however, Tyaira left school mid-day and did not return home. On the same day, Polk filed an incident report with the Shelby County Sheriff's Office. (Ex. 1.)

Randolph testified about his efforts to find Tyaira. According to Randolph, he checked with her friends and cousins, went back to school, and went through Tyaira's social media accounts. Randolph contacted a friend of Tyaira and asked him to arrange a meeting with Tyaira. On February 17, 2014, Tyaira's friend notified Polk and Randolph that he had arranged a meeting with Tyaira. At this meeting, Randolph ambushed Tyaira and took her home. Randolph instructed Polk to notify the police.

Polk testified that on February 17, 2014, she called the Shelby County Sheriff's Office as instructed by Randolph. Shelby County Officers Blake and Holmes were dispatched to the Coral Creek residence. Polk testified that she spoke to Tyaira

4

alone for fifteen to twenty minutes and that Tyaira was not responsive. According to Polk, when Polk told Tyaira that she would be sent to juvenile court, Tyaira confessed to Polk that Randolph had been touching her inappropriately. Polk testified that she did not believe Tyaira but that she conveyed Tyaira's allegations to the police who were in the garage talking to Randolph. Polk testified that she asked Tyaira whether Randolph was circumcised, and, according to Polk, Tyaira answered in the affirmative. Polk then immediately advised the officers that Tyaira was lying. Polk and Randolph both testified that Randolph was handcuffed and placed in the back of the police car.

Officer Blake, who has been a Shelby County Deputy Sheriff for two years,[2] provided a different account of the situation. According to Officer Blake, when he arrived at the Coral Creek residence, he first spoke with Randolph in the garage. Shortly thereafter, Polk exited the residence and informed him of Tyaira's allegations against Randolph. Officer Blake testified that Polk was shocked while Randolph remained quiet, without appearing angry or shocked. Officers Blake and Holmes went inside the house with Polk and Tyaira and advised Randolph to wait in the garage.

---

[2]Officer Blake stated that at the time of this incident, he had been a Shelby County officer for one year; and prior to that, he had been a Millington police officer for four years.

Officer Blake testified that Polk first believed her daughter, but then she told the officers that Tyaira was lying. Officer Blake testified that he did not recall Tyaira's answer after being asked whether Randolph was circumcised; however, he recalls that Polk broke down crying after she heard Tyaira's answer. Officer Blake spoke to Tyaira about her allegations. He testified that Tyaira alleged that Randolph touched her between her legs on the living room sofa. Officer Blake wrote a report with Tyaira's allegations. On cross-examination, Officer Blake stated that Tyaira was crying, visibly upset, and did not appear to be lying. Officer Blake testified that he did not recall whether Randolph was handcuffed and that Randolph was cooperative. Because Tyaira was a minor, Officer Blake called DCS.

Sabrina Wallace, who has been an investigator with DCS for seven years, arrived at the Coral Creek residence at approximately 4:30 pm on February 17, 2014. According to Wallace, Randolph was in the back of a police car but she did not recall if he was handcuffed. Following protocol, Wallace interviewed Polk and Tyaira separately. Wallace testified that Polk informed her of Tyaira's prior disciplinary issues and Tyaira's propensity for lying especially when she is in trouble. Polk informed Wallace that Tyaira had previously made similar allegations about an uncle, but had later recanted them.

Wallace testified that she interviewed Tyaira for a while. Tyaira told Wallace that Randolph last molested her in December. Tyaira was emotional, she made no eye contact at first, and she told Wallace she was ready to get out of the house. When Wallace confronted Tyaira with Polk's allegations, Tyaira started crying and did not respond. Tyaira told Wallace that her sister Morgan could corroborate her allegations. Morgan, however, did not corroborate Tyaira's story. Wallace testified that she did not have any reason to doubt Tyaira. Tyaira was consistent with her story and very emotional. Wallace wrote a report based on her interviews. Lastly, Wallace testified that Tyaira left the house with her paternal grandmother. The court finds Wallace to be a very reliable witness.

Both Polk and Randolph testified about Tyaira's propensity for lying and her sexual behavior. Polk testified that when Tyaira was in 8th grade, Tyaira posted on Facebook that she was pregnant. Further, six months after this incident, Polk caught Tyaira exchanging naked pictures with boys. When Polk confronted Tyaira on why she had sex on her mind, Tyaira told her while crying that she was raped when she was over at her grandmother's house. Polk stated that no one could corroborate the rape story. Polk also testified that when she was thirteen, Tyaira stole a cellphone from another classmate and that Tyaira only admitted to stealing the phone when she was caught red-

handed by the police. Polk stated that there was a hearing at juvenile court regarding this incident. Tyaira was not permitted to have boys over but she often disobeyed Polk and brought boys to her house. Polk also caught Tyaira lying to her friends that her mother and grandmother had died.

As to the instant allegations, Polk testified that Tyaira was not telling the truth based on the timing of the allegations. She believed that Tyaira was making the accusations in retaliation for being caught after she ran away and in order to avoid going to juvenile court. Polk stated that no one consulted her about her daughter's allegations or Polk's own explanation of events. Ever since this incident, Tyaira has been staying with her paternal grandmother and Polk and Tyaira have had a detached relationship.

Randolph testified that Tyaira began causing problems when she was in middle school. Randolph also stated that Tyaira had previously alleged that someone had raped her while she was in custody of her grandmother but had later recanted this allegation. Randolph further testified that Tyaira lied when she was in trouble; that she had lied to the babysitter about being pregnant; that she had frequent social media issues; that on one occasion she had told her friends that her mother had died; and that she had engaged in sexual activities with boys. On cross-examination, Randolph stated that the police were not

involved in and had no knowledge of any of these prior incidents. Randolph testified that Tyaira had always had a problem with him, she didn't like him, and she wanted her biological father to be around.

While on the witness stand, both Polk and Randolph testified about their criminal history. In 1996-1997, Randolph served time in federal court on drug conspiracy charges. In 2010, Randolph was arrested and indicted on drug charges but eventually the evidence against him was suppressed and the charges against him were dismissed. Polk testified that she has three prior marijuana convictions.

April Polk, Monique Polk's sister, testified about the events at Coral Creek residence on February 17, 2014. Upon arriving at the residence, April Polk saw Randolph in a police car. April Polk was not in the house when Polk asked Tyaira whether Randolph was circumcised. She stated that she saw her sister shortly after and there were no signs of Polk crying. April Polk testified that Polk told the officers that her daughter was lying. April Polk stated that she believes Tyaira lied about the sexual incidents with Randolph.

Officer Blake, who took the stand again following April Polk's testimony, stated that April Polk had not arrived at the residence yet when the circumcision conversation took place. Officer Blake's testimony after he was recalled back on the

stand was consistent with his initial testimony and the court finds him reliable.

B. <u>Tyaira's Forensic Interview and Randolph's Arrest</u>

Wallace testified that pursuant to protocol in a child sexual abuse case, DCS conducts a forensic interview with the accuser, in which law enforcement agents are present. Tyaira's forensic interview with DCS took place on February 27, 2014. Sgt. Hillman was present and watched this interview via camera. Wallace testified that while at times the police and the DCS investigator compare notes, Sgt. Hillman did not have access to Wallace's notes from her February 17, 2014 report. Wallace further stated that she did not personally participate in the forensic interview and is not sure whether information about Tyaira's history was shared with the police.

After the forensic interview, the Child Protective Investigatory Team ("CPIT"), which includes DCS representatives, prosecutors from the District Attorney's Office, and law enforcement agents, meets to decide whether to prosecute. According to Wallace, if the child makes allegations of sex abuse during the forensic interview, then the charges against the alleged abuser are considered substantiated and further investigation is recommended. Wallace testified that the CPIT meeting in the present case occurred in May 15, 2014.

Sgt. Hillman, who has been employed with the Shelby County Sheriff's Office for eighteen years and served as a detective with the Sex Crimes Unit for four to five years, testified at length about the investigation into Tyaira's allegations. Sgt. Hillman was assigned Tyaira's case on February 17, 2014 following Tyaira's allegations of sex abuse. Sgt. Hillman was provided the case notes including the February 12, 2014 incident report supplemented by Officer's Blake February 17, 2014 report. Sgt. Hillman contacted the DCS and was informed that DCS had scheduled a forensic interview with Tyaira. Sgt. Hillman observed the forensic interview via camera. In this interview, Tyaira alleged that Randolph began molesting her when she was eleven years old. Tyaira also identified distinctive marks in Randolph's genital area and stated that Randolph was uncircumcised. Sgt. Hillman testified that she observed Tyaira's demeanor, and based on her experience and training, she believed Tyaira.

Sgt. Hillman testified that subsequent to the forensic interview, on March 4, 2014, Randolph arrived at her office without his lawyer and submitted to an interview. At this interview, Randolph informed Sgt. Hillman that Tyaira was a troubled child and that she had made a similar false accusation before. Sgt. Hillman testified that she did not inquire any further into Tyaira's prior accusation because it had not been

reported to authorities. Randolph also told Sgt. Hillman that he possessed an iPad with evidence of Tyaira's lack of reliability, but he refused to turn such evidence in stating he needed to talk to his lawyer. Further, Randolph refused to consent to a photograph of his distinctive mark.

Randolph testified about meeting with Sgt. Hillman. He testified that Sgt. Hillman contacted him by phone and arranged a meeting at the station. Randolph's interview with Sgt. Hillman lasted for two or three hours, and he was allowed to leave once it was over. Randolph asserts that the first question Sgt. Hillman asked him was whether he was a drug dealer. Sgt. Hillman does not recall asking Randolph whether he was a drug dealer; however, she testified that she could have posed such a question because Tyaira might have mentioned in her forensic interview that Randolph was selling drugs. Randolph testified that he refused to consent to being photographed until he spoke to his lawyer.

As to the distinctive mark identified by Tyaira, Randolph testified that it is located in his inner thigh and it is noticeable when he wears shorts. Polk also testified that the mark is located on Randolph's lower inner thing, approximately five inches above the knee. Polk testified that the mark is visible when Randolph wears swimming trunks and that Tyaira

might have seen this mark at any time over the years they lived together.

On March 5, 2014, the day following Randolph's interview, Sgt. Hillman signed the affidavit for his arrest warrant. (Ex. 3.) Sgt. Hillman testified that she met with a special victims prosecutor who made the call to arrest Randolph based on the forensic interview of Tyaira, the March 4, 2014 interview of Randolph, and Randolph's refusal to consent being photographed. Sgt. Hillman testified that she did not remember when the CPIT meeting was held and that protocol does not dictate that a CPIT meeting is required prior to making a decision of arrest. Later the same day, Sgt. Hillman sought a search warrant to photograph Randolph's genital area.

Sgt. Hillman testified that she did not contact Polk or Tyaira's school to ascertain Tyaira's reliability and that she followed normal procedure by attending the forensic interview and interviewing Randolph. Sgt. Hillman stated that she has eighteen years of experience in conducting interviews and making credibility assessments. Based on her training and experience she believed Tyaira. She did not believe Randolph because he refused to show her the proof he claimed to possess and he refused to consent to being photographed. Sgt. Hillman stated that although she knew Tyaira was a runaway, she did not view such incident as an indication of a lack of credibility as it is

common for assault victims to act out and run away from home. Sgt. Hillman testified that she checked the sex offender registry and did not find any prior offenses for Randolph. When asked whether she was aware of Randolph's prior drug convictions, she stated that when she prepares a state case, she typically attaches the defendant's criminal record. She testified, however, that she is not certain whether she specifically looked at Randolph's prior criminal record and that she did not discuss his criminal record with anyone.

C.  Search of Coral Creek Residence

On March 6, 2014, the day after the arrest warrant was issued for Randolph, members of the Fugitive Apprehension Team went to the Coral Creek residence to serve the felony arrest warrant on Randolph.  (*See* Ex. 4.)  The officers knocked on the door and Polk invited them in.  (*Id.*)  Officers observed in plain view on a nightstand a plastic bag filled with what appeared to be marijuana, which Polk stated it was hers.[3]  (*Id.*)

Polk recalled the March 6, 2014 events at the Coral Creek residence differently.  According to Polk, when officers arrived at the Coral Creek residence they told her they had a search warrant.  When she asked to see the search warrant, the police stated that they only had an arrest warrant for Randolph.  Polk

_____

[3]Based on these facts, Detective Jones later sought a state search warrant for the Coral Creek residence for evidence of drugs, contraband and other paraphernalia.  (*Id.*)

testified that although she did not give them permission to search, the officers went inside the residence and performed a search.  According to Polk, the officers found marijuana in the top drawer of her nightstand, not in plain view,[4] and then told her that if she got Randolph to the house, the officers would flush the marijuana.  Polk then called Randolph who was arrested upon arriving at the residence.  Polk further testified that when she was in the back of the police car, she was asked to sign a consent-to-search form, which she refused to sign.  Polk later pled guilty to possession of marijuana.  She did not file a motion to suppress the marijuana.

Polk's sister, Christle Polk, also testified about the events at the Coral Creek residence on March 6, 2014.  Christle Polk stated that she was called by an officer to the Coral Creek residence to get her sister's children because her sister had just been arrested.  When she arrived at the Coral Creek residence, an officer took her to a backroom and asked her questions about Tyaira.  Christle Polk testified that officers told her that if her sister turned Randolph in, she would not go to jail.

Polk and her sister Christle Polk both testified that Detective Vance pushed a security camera away stating that he

_____

[4]Randolph also testified that Polk keeps marijuana in the nightstand drawer.  Randolph added that, regardless, Polk would not be in possession of that amount of marijuana.

did not like being on camera. Both Polk and Christle Polk
stated that the cameras do not have recording capabilities and
that they did not file any complaints against the police for
their conduct at the Coral Creek residence. Detective Vance, on
the other hand, testified that there was a camera system at the
Coral Creek residence, but he did not recall anyone moving the
camera.

D.   Search of Market Square Residence

Sgt. Hillman testified that on March 6, 2014, subsequent to
Randall's arrest, Tyaira and her grandmother came to her office
seeking help to retrieve clothing from Tyaira's house. During
this meeting, Tyaira informed Sgt. Hillman that she had kept
notes about Randolph's assaults in black and white composition
books located at the Market Square residence. Tyaira also
testified that a note she wrote to her sister corroborating her
allegations was located at the Market Square residence. Based
on this information, Sgt. Hillman helped Detective Hawkins
prepare an affidavit requesting a document search warrant for
the Market Square residence. Although Detective Hawkins is the
affiant in this affidavit, Sgt. Hillman testified that she
provided some information to Detective Hawkins and read the
affidavit before it was submitted to the issuing judge.

Detective Hawkins testified that she has been employed with
the Shelby County Sheriff's Office for six years and has worked

16

as a detective for one year.  She had worked under Sgt. Hillman

for one month before being assigned to the instant case in March

2014.[5]   While Detective Hawkins did not participate in the

February 2014 investigation of Randolph, she watched via video

Tyaira's forensic interview and was assisted by Sgt. Hillman in

completing the affidavit for the Market Square residence

document search warrant.  This affidavit states the following:

> 2/27/2014 in a forensic interview with T. Onry, victim
> disclosed her step father [] Darryl Randolph began
> sexually abusing her when she was 11 YOA.   Victim
> advised it started when she was sleeping in her
> bedroom at 7109 Market Square, Memphis, TN 38125, and
> suspect Randolph would touch her vagina with his hand
> and penetrate her with his fingers.   Victim stated
> that when the abuse began, she began to write about
> the incidents in her diary, which was left inside the
> residence at 7108 Market Square.   Victim advised this
> went on for several years while both victim and
> suspect resided at 7108 Market Square, Memphis, TN
> 38125, and each time the suspect would tell her not to
> say anything.   Victim disclosed there were numerous
> times she was sitting on the couch, the suspect would
> sit beside her, and "finger" her while they were both
> covered with a blanket.   Victim disclosed on one
> occasion, the suspect forced her hand and head down on
> his "dick".   The victim admitted to having oral sex
> one other time while in the kitchen.   Victim stated
> there was a school function that night and she knew he
> would let her go if she performed oral sex on him.
> Victim advised Randolph is not circumcised and
> described a distinct mark on the skin on his inner
> thigh. . . .  While detectives were speaking with
> victim, she disclosed that she and her family have a
> dual living arrangement where both residences are

---

[5]Detective Hawkins testified that she worked in the Sex
Crimes Division only for a few months.   She began working in
this division in approximately February 2014 and left in May
2014.   During this time, she took a week long Amber alert class
to receive training in sexual assault cases.

still being occupied. Detectives believe that
photographs of the interior of 7108 Market Square are
pertinent to this investigation, as well as a search
for the above referenced diary with accounts of the
sexual abuse.

(Ex. 2.)

Detective Hawkins also testified that she typed this
affidavit under Sgt. Hillman's supervision and that Sgt. Hillman
provided her with some of the information in this affidavit.
Detective Hawkins did not personally observe the photographs
taken of Randolph's genitalia. She testified that she had no
reason to question Sgt. Hillman's veracity. As stated above,
Detective Hawkins testified that she personally watched Tyaira's
forensic interview, in which Tyaira appeared distraught and
visibly upset. Detective Hawkins stated that nothing about
Tyaira's testimony led her to suspect that Tyaira was not
telling the truth. Detective Hawkins was aware that Tyaira was
a runaway. She testified that she did not state as much in the
affidavit because it had no relevance to the sexual assault
allegations.[6] Detective Hawkins stated that she did not contact
Polk, Tyaira's teachers, Tyaira's school counselor, or the
officers who took the incident report on February 12 and 17,
2014, before preparing the affidavit. On cross-examination,
Detective Hawkins stated that they had no reason to believe they

---

[6]Further, Detective Hawkins testified that during her
training, she was alerted that sexual abuse victim often act out
by running away from home.

would find drugs at the Market Square residence. The affidavit she prepared was to investigate the alleged sexual assault.

Sgt. Hillman also testified that the affidavit does not contain untrue or misleading facts and that she did not omit any facts from Detective Hawkins. Sgt. Hillman stated that she did not disclose in the search affidavit that Tyaira was a runaway because she believed it had no relevance to the sexual abuse allegations. She testified that she believed Tyaira and was not in possession of any information that made her doubt Tyaira's reliability.

The court finds Sgt. Hillman's and Detective Hawkins's testimony to be highly credible. Sgt. Hillman and Detective Hawkins testified consistently with one another lending further weight to their credibility. To the extent their testimony differs from that of other witnesses called by Randolph, the court finds the consistent testimonies of Sgt. Hillman and Detective Hawkins to be more reliable.

Based on Detective Hawkins's affidavit, Criminal Court Judge Coffey issued a search warrant for the Market Square residence for written documents, including diaries, composition books, letters, and photographs of the interior of the home. (Ex. 2.) Detective Hawkins testified that during the search a composition notebook was found but it did not contain anything supporting the allegations of sexual abuse.

Detective Vance, who has been employed with the Shelby County Sheriff's Office as a Narcotics Detective for six or seven years, stated that he was part of the narcotics search at the Coral Creek residence and the document and narcotics searches at the Market Square residence. Detective Vance stated that he had no knowledge of Randolph prior to the Coral Creek search. As to the Market Square residence, Detective Vance testified that four officers from the Narcotics Department went to the Market Square residence to assist the General Investigation's Bureau in breaching the door.[7] However, upon arrival they realized that they did not have to breach the door, at which point, they assisted with the document search. Detective Vance testified that no federal officers were present at either of these searches and that he had no discussions with anyone about Randolph's prior federal drug charges.

During the document search, officers found a brown substance which tested positive for heroin. Based on this, Detectives Vance and Jones secured a search warrant for the Market Square residence for evidence of heroin, drug paraphernalia, drug records and drug proceedings. (Ex. 5). The search for narcotics led to the discovery of cocaine, heroin, marijuana, and a firearm. (Ex. 6.) Based on this

---

[7] Detective Vance testified that narcotic officers have more experience in breaching doors.

discovery, Detectives Vance and Barnes sought and were granted another arrest warrant for Randolph.  (*Id.*)

## II.  PROPOSED CONCLUSIONS OF LAW

In the present motion, Randolph does not argue that the Market Square residence narcotics search warrant — which led to the evidence that Randolph now seeks to suppress — lacked probable cause.  Instead, he argues that the evidence retrieved pursuant to the Market Square narcotics search warrant was fruit of the poisonous tree and must be suppressed.  Randolph argues that the Market Square narcotic search warrant was a result of "bootstrapping" off his first arrest warrant, the Coral Creek residence search warrant, and the Market Square document search warrant.  (Def.'s Mot. to Suppress 9, ECF No. 19.)  Randolph argues the investigation into the sexual allegations was in fact a "front" to pursue a drug investigation into Randolph and that the various warrants were all contrived in furtherance of the drug investigation.  At the hearing, Randolph claimed that such agenda was orchestrated by the police on or after Randolph's March 4, 2014 interview with Sgt. Hillman.

Further, Randolph seeks to suppress evidence seized from the Market Square residence on the ground that the law enforcement officers in seeking the document search warrant did not "attempt to present to the issuing Magistrate any support for reliability," they simply referred to a forensic interview

with no further information, and they intentionally omitted background information regarding the informant which was known to law enforcement at the time in violation of *Franks v. Delaware*, 438 U.S. 154 (1979). (Def.'s Mot. to Suppress 10-11, ECF No. 19.)

In response, the government argues that the Market Square document search warrant was based on probable cause and that Randolph is not entitled to a *Franks* hearing because he has failed to make a substantial preliminary showing that the police intentionally or recklessly omitted information from the search warrants.

From the arguments raised in Randolph's motion to suppress and at the hearing, the court finds two critical issues: (1) whether the various warrants were contrived, and thus, lacking in probable cause, and (2) whether Randolph is entitled to a *Franks* hearing based on his assertion that officers "studiously" omitted necessary information from the warrants.

A.    Probable Cause Determination

While Randolph takes issue with the entirety of the investigation, the court need only examine the legality of the police action that led to the discovery of the narcotics and to Randolph's March 7, 2014 statement claiming ownership of the narcotics. The narcotics were discovered pursuant to a narcotic search warrant which was based on the officer's discovery of

heroin during the execution of the Market Square document search warrant. (Ex. 5.) Accordingly, if the document search of the Market Square residence was an unlawful search, then any evidence discovered as a result would constitute fruit of the poisonous tree and be suppressed from evidence. Randolph's March 7, 2014 statement was given while he was in police custody following the Market Square residence narcotics search. It appears that Randolph seeks suppression of his confession because it was also fruit of the poisonous tree. Because the finds that both Randolph's arrest and the Market Square search were constitutional, Randolph's confession and the narcotics recovered were not fruit of the poisonous tree.[8]

The Fourth Amendment states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV. The Fourth Amendment's probable cause

---

[8]Furthermore, Randolph's confession was voluntary, (ECF No. 25-5), and not derived immediately from his arrest or the Market Square residence narcotics search. *See Wong Sun v. United States*, 371 U.S. 471, 485-86 (1963)(stating that "verbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest" is fruit of the official illegality)(citation omitted)). As the Supreme Court explained in *Wong Sun*, an illegal police action does not render all subsequently discovered evidence inadmissible per se. *Id.* at 487-88. Rather, a confession that is "sufficiently an act of free will [] purge[s] the [] taint" of a prior constitutional violation. *Illinois v. Brown*, 422 U.S. at 602; *United States v. Baldwin*, 114 F. App'x 675, 683 (6th Cir. 2004)("A confession obtained through custodial interrogation after an illegal arrest must be excluded from evidence unless it is attenuated enough from the arrest that the confession is 'sufficiently an act of free will to purge the primary taint.'" (citing *Brown*)).

requirement applies in a like fashion both to arrest warrants and to search warrants. *United States v. Calandrella*, 605 F.2d 236, 243 (6th Cir. 1979)(citing *Aguilar v. Texas*, 378 U.S. 108, 112 n.3 (1964)). A police officer has probable cause for arrest where there are "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)(citations omitted); *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002). "In determining whether to issue a search warrant on the basis of a particular affidavit, a magistrate must review the affidavit according to the totality of the circumstances and 'make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying the hearsay information, there is probable cause.'" *United States v. Fowler*, 535 F.3d 408, 414 (6th Cir. 2008)(citing *United States v. Smith*, 510 F.3d 641, 652 (6th Cir. 2007)).

Courts draw a distinction between a confidential informant's tip and a victim's report. While an affidavit based on an informant's tip requires a showing of the informant's credibility, a victim's report automatically contains indicia of

reliability. *See Rainer v. Lis*, No. 92-2436, 1994 WL 33969, at
*3 (6th Cir. 1994). The Sixth Circuit has held that "statements
of victims and eyewitnesses of crimes are entitled to a
presumption of reliability and veracity without independent
corroboration." *United States v. Ingram*, 985 F.2d 562 (6th Cir.
1993). An officer is entitled to rely on an eyewitness
identification to establish probable cause, "'unless, at the
time of the arrest, there is an apparent reason for the officer
to believe that the eyewitness was lying, did not accurately
describe what he had seen, or was in some fashion mistaken
regarding his recollection of the confrontation.'" *Ahlers v.
Schebil*, 188 F.3d 365, 370 (6th Cir. 1999)(citing *Rainer*, 1994
WL 33969, at *2); *see also United States v. Amerson*, 38 F.3d
1217, at *3 (6th Cir. 1994). Eyewitness statements are
generally entitled to a presumption of reliability and veracity
because they are based on firsthand observations. *Ahlers*, 188
F.3d at 370.

In *Ahlers*, a § 1983 case, the Sixth Circuit addressed the
issue of whether an accuser's sexual assault accusations
sufficed to support probable cause for the defendant's arrest
warrant. *Ahlers,* 188 F.3d at 370. The Sixth Circuit found:

> Thus, Stiltner's accusation that she had been sexually
> assaulted by Ahlers, standing alone, was sufficient to
> establish probable cause, especially when bolstered by
> Sheriff's Department's records which confirm that
> there was a window of time within which the alleged

sexual assault could have occurred.  It appears, then, that in order to sustain their claim that there are genuine issues of fact regarding the existence of probable cause, Plaintiffs would have to allege that the Defendants had reason to think that Stiltner's eyewitness identification was in some way untruthful or unreliable.  Plaintiffs, however, put forth no such allegations.  In fact, prior to Ahlers's arrest and up until immediately before the preliminary examination, Stiltner had relayed her allegations to both the Washtenaw County Defendants and to Parsons in a consistent manner.  Although Plaintiffs wish to make much of the fact that Stiltner was a prostitute and had a substance abuse problem . . . her status and occupation provide no reason to automatically assume she was dishonest.  Since the Ahlerses have set forth no facts which would support allegations that Stiltner was untruthful, there is no genuine issue of material fact that Defendants, acting on the basis of Stiltner's eyewitness account, had sufficient probable cause with which to arrest and charge Ahlers for sexual assault.

*Id.* at 370-71 (citations omitted).

Additionally, in *United States v. Ruth*, 489 F. App'x 941 (6th Cir. 2012), the Sixth Circuit held that sexual abuse allegations made by the defendant's son were sufficient to establish probable cause for a search warrant.  The court explained:

Although it is true that the police had no prior dealing with the son, the son fully identified himself, was not himself a suspect, was put through the crucible of a thorough interview by the police. In addition, the son presented graphic physical evidence supporting his allegations. Not to be overlooked is that the alleged wrongdoer was his father, and the son lived with his father in the house where the computers that stored the child pornography were located.  The circumstantial reliability of what was related to the police can only be described as enormous.  Any person reporting wrongdoing to the police, including an

informant who had provided reliable information 20
times in the past, could be lying. But, as all of the
case law makes clear, a common-sense approach must be
taken when evaluating reliability, and common sense
would suggest that the informant was reliable here.
The son appeared in person for a face-to-face
interview at the police station. This provided
officers with "the opportunity to observe [his]
demeanor and credibility" and to hold him accountable
if his story was later found to have been falsified.
This Circuit has found such circumstances highly
probative in assessing the reliability of a tip from a
previously unknown informant.

*Id.* at 943 (citing *Henness v. Bagley,* 644 F.3d 308, 318-19

(6th Cir. 2011)).

"Once an officer establishes probable cause, he or she is

under no obligation to continue investigating and may instead

pursue the arrest of a suspect." *Crockett v. Cumberland Coll.*,

316 F.3d 571, 581 (6th Cir. 2003)(citing *Klein v. Long,* 275 F.3d

544, 551 (6th Cir. 2001)); *see also Ahlers,* 188 F.3d at 371

("Once probable cause is established, an officer is under no

duty to investigate further or to look for additional evidence

which may exculpate the accused."); *Criss v. City of Kent,* 867

F.2d 259, 263 (6th Cir. 1988)("A policeman, however, is under no

obligation to give any credence to a suspect's story nor should

a plausible explanation in any sense require the officer to

forego arrest pending further investigation if the facts as

initially discovered provide probable cause.").

Tyaira's accusations that she had been sexually assaulted

by Randolph were sufficient to establish probable cause for his

arrest. Tyaira's statement was entitled to a presumption of reliability and veracity, and Sgt. Hillman had no reason to think that Tyaira was "untruthful or unreliable." *See Ahler*, 188 F.3d at 370-71. As the record shows, Tyaira had consistently relayed her allegations to Officer Blake, Wallace, and to the DCS agent who conducted the forensic interview. Officer Blake testified that he had no reason to doubt Tyaira. Similarly, Sgt. Hillman and Wallace witnessed Tyaira's forensic interview and personally observed her demeanor. Both e testified that based on their experience they had no reason to doubt Tyaira. *See Ahler*, 188 F.3d at 371; *Henness v. Bagley*, 644 F.3d 308, 318 (6th Cir. 2011)("An in-person tip gives the officer an opportunity to observe the informant's demeanor and credibility." (citations omitted)).

Tyaira's "proximity in time and space to the reported criminal activity," and the fact that she "acquired the information firsthand," further indicate the reliability of her accusations. *Henness*, 644 F.3d at 318. In addition, Tyaira's accusations were bolstered by her identification of a distinctive mark in Randolph's genital area as well as by Randolph's interview with Sgt. Hillman. *See Ruth*, 489 F. App'x at 943 ("In addition, the son presented graphic physical evidence supporting his allegations."). Because the information in the affidavit provides a substantial basis for finding that a

crime was committed, the judge was justified in making a finding of probable cause and issuing the warrant.

Contrary to Randolph's assertion at the suppression hearing, once Sgt. Hillman established probable cause to arrest Randolph, she was "under no duty to investigate further or to look for additional evidence which may [have] exculpate[d]" Randolph. *Ahler*, 188 F.3d at 371 (citing *Rainer*, 1994 WL 33969, at *2). If fact, Sgt. Hillman was under no obligation to give any credence to Randolph's explanations, and even if Randolph had offered a plausible explanation, it did not require Sgt. Hillman "'to forego arrest pending further investigation.'" *Ahler*, 188 F.3dat 371 (citing *Criss*, 867 F.2d at 263). Thus, Sgt. Hillman was under no duty to investigate Tyaira's past or her runaway incident, and moreover, it is unclear how these are relevant to the probable cause determination. Accordingly, Tyaira's statement, bolstered by Sgt. Hillman's interview with Randolph and Tyaira's identification of Randolph's distinct mark, provided Sgt. Hillman with ample probable cause to arrest Randolph. As a result, Randolph's arrest was not contrived to "bootstrap" a drug investigation into Randolph.

The Coral Creek residence search warrant's relationship to the instant motion to suppress is even less clear. Randolph does not seek to suppress any evidence recovered from the Coral Creek residence, and, regardless, the government has stated that

it does not intend to use any of the items recovered at the Coral Creek residence. Moreover, Polk has already pled guilty to possession of the marijuana found at the Coral Creek Residence. In short, this search did not affect Randolph in any way and the court does not consider the legality of this search warrant.

As to the Market Square residence document search warrant, the court finds that it was supported by independent probable cause. Sgt. Hillman testified that on March 6, 2014, Tyaira and her grandmother reached out to Sgt. Hillman to request assistance in collecting some clothing items from Polk's residence. At this meeting, Tyaira informed Sgt. Hillman about the existence of some composition books containing evidence of the alleged sex crime. Thus, Sgt. Hillman had another chance to observe Tyaira's demeanor and assess her reliability. Furthermore, the photographs taken of Randolph's genital area following his arrest corroborated Tyaira's allegations. Such circumstances were sufficient to support probable cause for the search of the Market Square residence. *See Ruth*, 489 F. App'x at 943 (finding that sexual abuse allegations made by the defendant's son were sufficient to establish probable cause for a search warrant in light of the son's face-to-face interview with the police and his description of graphic physical evidence supporting his allegations).

At the suppression hearing, Randolph also argued that the Market Square residence document search warrant was deficient because Detective Hawkins, the affiant of the search warrant, relied on Sgt. Hillman's statements. However, this does not vitiate the existence of probable cause because "the collective knowledge of agents working as a team is to be considered together in determining probable cause." *United States v. Woods*, 544 F.2d 242, 259-60 (6th Cir. 1976); *see also United States v. Duval*, 742 F.3d 246, 253 (6th Cir. 2014)(citing *Woods*). If agents work as a team, "the group's knowledge of a fact may be considered by a reviewing court, 'not just the knowledge of the individual officer who physically effected the arrest.'" *Duval*, 742 F.3d at 253 (citing *Woods*). Detective Hawkins and Sgt. Hillman were working as a team in investigating Tyaira's sexual allegations against Randolph. Although Detective Hawkins did not have first-hand knowledge of some of the information, she could "act on directions and information transmitted" by Sgt. Hillman. *See United States v. Lyons*, 687 F.3d 754, 766 (6th Cir. 2012).

Ultimately, there simply exists no evidence of an orchestrated police enterprise to contrive a series of warrants leading to the discovery of narcotics. Randolph's allegation that the drug investigation was contrived by the police is undermined by the fact that Randolph and Polk initially

contacted the police and enlisted their assistance on February 12, 2014 when Polk reported the runaway incident and again on February 17, 2014 when Tyaira was located. Further, it is undisputed from the record that it was Tyaira who reached out to Sgt. Hillman on March 6, 2014 and informed her about the composition books at the Market Square residence. As discussed above, each warrant at issue was supported by independent probable cause.

B.    Entitlement to a *Franks* Hearing

The second critical issue is whether Randolph is entitled to a *Franks* hearing based on his assertion that officers "studiously" omitted necessary information from the warrants. The Supreme Court has held on numerous occasions that hearings are impermissible when the defendant challenges the sufficiency of the search warrant affidavits. In *Aguillar v. Texas*, 378 U.S. 108, 109 (1968), the Court noted "[i]t is elementary that in passing on the validity of a warrant, the reviewing court may consider only information brought to the magistrate's [the issuing judge's] attention." There is, however, an exception to this general rule created by *Franks v. Delaware*, 438 U.S. 154 (1978). In *Franks*, the Supreme Court held that a court may have a hearing in which it considers evidence that was not before the issuing judge if the defendant can show that the affiant made a false statement or recklessly disregarded the truth in his

affidavit. *Id.* at 155-56. However, before such a hearing, the defendant must first make a substantial preliminary showing that a false statement, which was necessary to the finding of probable cause, was knowingly or recklessly included by the affiant in the warrant affidavit. *Id.*; *United States v. Elkins*, 300 F.3d 638, 349-41 (6th Cir. 2002).

*Franks* also extends to circumstances in which an officer intentionally or recklessly omits evidence in a search-warrant affidavit that is critical to determining the existence of probable cause. *See United States v. Carpenter,* 360 F.3d 591, 596 (6th Cir. 2004)(en banc)("[T]his court has recognized that material omissions [from an affidavit] are not immune from inquiry under *Franks.*" (citation and internal quotation marks omitted)). "[T]o be constitutionally problematic, the material must have been deliberately or recklessly omitted and must have *undermined* the showing of probable cause." *Id.* at 596–97; *see also Duval*, 742 F.3d at 250-51 (citing *Carpenter*). Thus, under *Franks* the defendant is entitled to an evidentiary hearing on the veracity of the omissions in the affidavit if and only if (1) there is a substantial preliminary showing that the affiant omitted information deliberately or recklessly and (2) the affidavit, with the omitted material, undermines the showing of probable cause. *Carpenter*, 360 F.3d at 597; *United States v.*

*Graham*, 275 F.3d 490, 506 (6th Cir. 2001); *United States v. Atkins*, 107 F.3d 1213, 1216-17 (6th Cir. 1997).

"[A]n affidavit which omits potentially exculpatory information is less likely to present a question of impermissible official conduct than one which affirmatively includes false information." *Atkins*, 107 F.3d at 1217. Thus, in the case of an alleged omission from an affidavit, a *Franks* hearing will be justified only in "rare instances." *Mays v. City of Dayton*, 134 F.3d 809, 815 (6th Cir. 1998).

"An affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation." *Id.* (citing *United States v. Colkley,* 899 F.2d 297, 302 (4th Cir. 1990)). The focus is whether the affiant *herself* — and not the nongovernmental informant — engaged in deliberate or reckless disregard for the truth in omitting critical information from the affidavit. *See Franks*, 438 U.S. at 171; *United States v. Hudson*, 325 F. App'x 423, 426 (6th Cir. 2009); *see also Rugendorf v. United States*, 376 U.S. 528, 532-33 (1964)(stating that erroneous statements in an affidavit that were not those of the affiant failed to show that the affiant acted in bad faith or that he made any misrepresentations in securing the warrant). While there is no clear list of what information the affiant must include in an affidavit, "the general idea is that the 'issuing judicial officer [must be]

reasonably assured that the informant was credible and the information reliable.'" *United States v. Jones*, 533 F. App'x 562, 569 (6th Cir. 2013)(citing *United States v. Williams*, 224 F.3d 530, 532 (6th Cir. 2000)).

In his motion to suppress, Randolph vaguely stated that:

Defendants submits that the conduct of law enforcement from the point of seeking an arrest warrant through the application for search warrant with no attempt to present to the issuing Magistrate any support for reliability; the reference to a forensic interview with no further information; and the studious omission of any background information known to law enforcement at the time and regarding the "informant[]" upon whom the application was based reflects an intentional attempt by law enforcement to justify a means by the end.

(Def.'s Mot. to Suppress 10-11, ECF No. 19.) Because the instant case consists of two different arrest warrants and at least four different search warrants, the court allowed an evidentiary hearing to narrow down Randolph's claims. At the hearing, Randolph did not argue that the affidavit contained any material falsehood. Rather, Randolph contended that the various affidavits submitted by police officers omitted information which showed that the accuser's credibility could be questioned.

Randolph failed to make the required preliminary showing that would permit this court to hold a *Franks* hearing. Randolph argued that the police officers deliberately omitted material information and thereby misrepresented the reliability of Tyaira Polk in the March 5, 2014 arrest warrant and the March 7, 2014

document search warrant for the Coral Creek residence. First, it is unclear how Tyaira's reliability was misrepresented. Apart from Randolph's and Polk's unsubstantiated and biased assertion that Tyaira was not telling the truth, Randolph has put forth no other evidence to support his claim that Tyaira is a person of questionable veracity. *Cf. Jones*, 533 F. App'x at 568 (stating that the defendant asserted the informant was unreliable because, *inter alia*, he had a criminal record of violent offenses, attempted rape, and a meth addiction, all of which were omitted from the affidavit).[9]

Second, the focus is whether the *affiant* engaged in deliberate or reckless disregard for the truth in omitting critical information from the affidavit. At the hearing, Randolph put on many witnesses attacking the veracity of Tyaira's allegations. Ultimately, such testimony was irrelevant because it "attack[ed] only the *informant's* credibility . . . not that of [the affiant]." *Hudson*, 325 F. App'x at 426. Randolph has not made any showing that Sgt. Hillman, the affiant for Randolph's March 5, 2014 arrest warrant, or Detective Hawkins, the affiant for Market Square document search warrant, were aware of Tyaira's unreliability or had any other damaging information regarding Tyaira which they withheld from the

---

[9]Although Randolph maintained at the hearing that Tyaira's identification of Randolph's distinct mark was incorrect, no evidence was offered by Randolph to support his assertion.

affidavits. Randolph offered no proof that would suggest to the court that the information provided by Tyaira was known to the affiants to be false, or that the affiants recklessly included such information in the affidavits without attempting to establish the accuracy of its content. While Polk informed Wallace on February 17, 2014, that she frequently caught Tyaira in lies and that Tyaira had made a similar false allegation in the past, Wallace testified that she did not share her report with the police.[10]

Further, while there was testimony at the hearing that police had been previously involved in an incident where Tyaira stole a phone from a classmate and lied about it, there was no testimony that Sgt. Hillman or Detective Hawkins were aware of that incident. Moreover, because there is no evidence that any of the officers involved in the cell phone incident communicated with the officers involved in the instant investigation, the collective-knowledge doctrine does not apply. *Duval*, 742 F.3d at 253. Accordingly, Randolph has offered no proof or made a

_____

[10]In addition, while Randolph seems to make much of the fact that Tyaira had displayed sexual tendencies at a young age, such fact provides "no reason to automatically assume she was dishonest." *Ahlers*, 188 F.3d at 371 (citing *Conner v. United States*, 7 F.2d 313, 314 (9th Cir. 1925)("While there is some conflict in the authorities, the better rule is that a female witness cannot, under ordinary circumstances, be impeached by an attack upon her character for chastity."); *People v. Williams*, 416 Mich. 25, 45, 330 N.W.2d 823 (Mich. 1982)("The law should not recognize any necessary connection between a witness's veracity and her sexual immorality.")).

substantial showing that would suggest to the court that the information provided by Tyaira was known to the affiants to be false, or that the affiants recklessly included such information on the affidavit without attempting to establish its accuracy.

Randolph also argues that the affidavits merely relied on the forensic interview and the affiants failed to corroborate Tyaira's story. However, as stated above, statements of victims are "entitled to a presumption of reliability and veracity without independent corroboration." *Ingram*, 985 F.2d 562, at *2 (citations omitted). Although Randolph claimed he possessed exculpatory evidence in an iPad, he refused to turn such evidence over to Sgt. Hillman. Once Sgt. Hillman established probable cause, she was not obligated "to give any credence to [Randolph's] story," before arresting him. *Ahler*, 188 F.3d at 371 (citations and internal quotation marks omitted). In addition, one way to corroborate Tyaira's allegations was to access Tyaira's composition books, which required issuance and execution of a search warrant. *See Ruth*, 489 F. App'x at 942 (stating that the only way to corroborate the victim's story was to search the defendant's computer). In conclusion, Randolph has not made a strong preliminary showing that the officers intentionally misled the issuing judge or that the judge was not reasonably assured that the information in the affidavit was credible.

As to the second prong, the inclusion of any of the alleged omissions would not defeat the showing of probable cause. Had the officers included information about Tyaira's previous trouble with her mother and step-father, such information would not serve to question her reliability as to the instant incident and it would not have undermined probable cause. A teenager's prior disciplinary record is hardly a reason to doubt the reliability of the information given to the affiants, especially given the consistency of her accusations and her identification of Randolph's distinct mark.

Lastly, as to Randolph's argument that the warrant should have included the circumstances of the allegations, such as the fact that Tyaira had run away from home, Sgt. Hillman and Detective Hawkins testified that it is common for assault victims to act out and run away from home. Therefore, this information supports the finding of probable cause instead of undermining it. *Cf. Carpenter*, 360 F.3d at 597 ("Moreover, the omitted facts would have *bolstered* the affidavit's showing of probable cause, not undermined it.").

Accordingly, the court concludes that a *Frank* hearing is not and was not justified.

## III. RECOMMENDATION

For the reasons expressed above, it is recommended that Randolph's motion to suppress be denied.

Respectfully submitted this 5th day of May, 2015.


                              s/Diane K. Vescovo
                              DIANE K. VESCOVO
                              UNITED STATES MAGISTRATE JUDGE



                              NOTICE

        Within fourteen (14) days after being served with a copy of
this report and recommended disposition, a party may serve and
file written objections to the proposed findings and
recommendations.  A party may respond to another party's
objections within fourteen (14) days after being served with a
copy.  Fed. R. Civ. P. 72(b)(2).  Failure to file objections
within fourteen (14) days may constitute a waiver of objections,
exceptions, and further appeal.